# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

LANCE D. BUTLER, JR.,
        Petitioner,

v.                                                          Case No. 16-C-1615

BRIAN FOSTER,
        Respondent.

## DECISION AND ORDER

Lance D. Butler, Jr., petitions for a writ of habeas corpus under 28 U.S.C. § 2254.

## I. BACKGROUND

Following a jury trial in Milwaukee County Circuit Court, Butler was found guilty of one count of arson and two counts of first-degree recklessly endangering safety. The endangering safety counts arose out of the arson—the fire trapped a person in her apartment and endangered both that person and the firefighter who rescued her. On the arson charge, the court sentenced Butler to 16 years' initial confinement and six years' extended supervision. On each recklessly-endangering-safety charge, the court sentenced Butler to four years' initial confinement and two years' extended supervision, to run consecutively to the arson charge.

At trial, Butler's ex-girlfriend (whom the state court of appeals identified only as "M.L.") testified that, on the night of February 20, 2011, Butler arrived at her apartment and started banging on her door and yelling at her. M.L. had broken up with Butler a few weeks before, and she was in her apartment watching movies with a friend, who was male. Butler made comments suggesting that he was upset that she was with another man. Butler then threw a fire extinguisher through M.L.'s living room window,

reached through the broken glass, and pointed a gun at her.  When M.L. and her friend retreated to the bedroom, Butler used a second fire extinguisher to break the window of the patio door that opened into her bedroom.

M.L. called the police, but they did not arrive until after Butler had left the scene. Butler made phone calls to M.L. using his cellular telephone while the police were at the apartment, and the police listened to the calls.  M.L. testified that Butler was laughing on the calls and said that he "ain't finished."  Tr. at 39, ECF No. 22-10.

At about 7:20 the next morning, a fire was reported at M.L.'s apartment.  M.L. was not in her apartment at the time—because of the damage to her apartment from the night before, she was staying at a friend's house.  However, one of M.L.'s neighbors was at home at the time of the fire and was trapped in her apartment.  A firefighter rescued the neighbor, but he was injured in the process.

A few hours after the fire was reported, M.L. discovered that she had received text messages from Butler earlier that morning, while her phone was off.  The messages were not sent from Butler's phone, but M.L. could tell that they were authored by Butler. Some of the texts either strongly implied or directly stated that M.L.'s apartment was on fire.  One text said, among other things, that "I smell fire."  Tr. at 45, ECF No. 22-10. Another text read, "Thanks for my movies and da drank ha-ha. You better go put that fire out."  *Id.* at 46.  Another read, "I told you I'm just getting started, ho. Why, I'm guessing you getting fucked. Your ho[u]se is on fire, ho. Ha-ha."  *Id.*  Still another read, "I told you this ain't what you want. Now your house is on fire, ho."  *Id.* at 47.  Still another read, "Watch my movies and da drink, and yo house went up in flames. Ha, ha,

ha. I told you I was going to catch you." *Id.* at 50.  Another text suggested that M.L.'s clothes and her couch had been set on fire.  *Id.*

The police investigated the fire as a possible arson, and Butler was a suspect.  A detective subpoenaed Butler's cell phone records from his carrier.  The carrier gave the police a report listing all the calls that Butler made on February 21, 2011, the numbers that he called, the time of the calls, the cell tower that Butler's calls connected to, the GPS coordinates of each of the towers, and which antenna on the tower serviced the call.  As to this last bit of data, the testimony at trial established that, typically, a cell tower will have three antennae, with each antenna pointing in a different direction.  Each antenna generally covers a 120-degree sector of a circle (with the tower at the center of the circle) such that the three antennae together provide 360-degrees of coverage around the tower.  The cell phone records indicate which antenna on the tower was used to compete the call.  This, in turn, provides some indication of the direction from which the call was made.  For example, a call made from the south side of the tower will generally connect with an antenna whose 120-degree sector includes the south side of the tower.

After the detective received Butler's cell phone records, she gave them to a fellow officer, Brian Brosseau, who worked in the department's "Intelligence Fusion Center."  Brosseau's duties included mapping and analyzing cell phone records.  Brosseau used the cell phone records to create a map showing the locations of the cell towers that were used to make each call.  Brosseau then added "pie slices" to the map to show the estimated coverage area of the antenna on each tower that the phone connected to.  Each pie slice was a sector of a circle with the cell tower at the center.

The central angle of each sector was 120 degrees, to reflect the 120-degree coverage area of the antenna. Each radius represented a one-mile or one-and-a-half-mile distance from the cell tower, which Brosseau testified represented the typical range of an antenna located in the City of Milwaukee. Tr. at 100, ECF No. 35-1.

At trial, Brosseau testified about his map and about the general operation of cell phones and cell towers. A second police officer, Eric Draeger, offered similar testimony.

Brosseau's map showed that, on the morning of the fire, Butler's phone made a series of calls that connected to cell towers along a path from Butler's uncle's house to M.L.'s residence, and then to the home of Butler's uncle's girlfriend, Melveretta Bradford. The path corresponded with Milwaukee County bus routes that a person could have used to get from Butler's uncle's house to M.L.'s house, and then from M.L.'s house to Bradford's house. The cell records also showed that, approximately two hours before the fire, Butler's phone called the Milwaukee County Transit System's automated route-information number. The police also determined that the text messages that M.L. received on the morning of the fire—which taunted her about the fact that her house was on fire—were sent from cell phones that belonged to Bradford's children. These text messages were sent approximately 90 minutes after the fire.

Neither Brosseau nor Draeger opined that Butler's phone was definitely within each pie slice on the map at the times reflected. Rather, Brosseau testified that cell phones will connect with the tower sending the strongest signal to the phone, and that usually this is the closest tower. Tr. at 89–90, ECF No. 35-1. But he noted that not every call will connect with the closest tower because other factors, including weather and terrain, may cause a more distant tower to send a stronger signal to the phone. *Id.*

4

at 90. Employees from two cell phone companies (Sprint and Verizon) also testified that cell phones will connect with the tower sending the strongest signal and that usually but not always this is the closest tower. Tr. at 75 & 99–101, ECF No. 22-9.

Butler did not testify at the trial. However, his uncle testified that Butler was with him at Bradford's house for the entire time starting on the Friday before the fire until after the fire occurred on Monday morning. Tr. at 13–21, ECF No. 22-11. Butler's uncle testified that he saw Butler in the house at 7:30 a.m. on the morning of the fire. *Id.* at 20. This testimony was intended to provide Butler with an alibi, as Butler's uncle testified to seeing Butler at almost the exact time that the fire was reported. Because Bradford's house was located more than 10 miles from M.L.'s house, Butler could not have been at M.L.'s house if in fact his uncle was with him at Bradford's house at 7:30 a.m.

The jury convicted Butler on the arson and the recklessly-endangering-safety counts. It was unable to reach a verdict on a criminal-damage-to-property count that arose out of the events that occurred at M.L.'s apartment the night before the fire.

Butler filed a postconviction motion claiming that his trial counsel rendered ineffective assistance by not objecting to the testimony of Officers Brosseau and Draeger. Butler argued that these officers gave expert testimony and opinions, and that trial counsel should have asked for a hearing to determine if they were qualified to give that testimony and whether their opinions satisfied the criteria of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), which the State of Wisconsin had recently incorporated into its rules of evidence.

5

After Butler filed this motion, the parties suggested that the trial court hold a post-trial *Daubert* hearing to determine if the officers' testimony was admissible. They reasoned that if the testimony would have been admissible under *Daubert*, then Butler's trial counsel could not have been ineffective in failing to object on that ground. The trial court agreed with this approach and held what the state courts and the parties described as a *nunc pro tunc Daubert* hearing. At this hearing, both officers testified that they had received training about cell phone records and how to use them for law-enforcement purposes. They also testified that the map used at trial was largely nothing more than a visual depiction of the data included in the cell phone records—Brosseau merely displayed on a map the geographic location of each cell tower, and the direction of the antenna to which the phone connected. However, Brosseau also testified that he added an "approximate range of service" for each cell tower—meaning the mile-to-mile-and-a-half distance represented by the radii of the sectors on the map. Tr. at 21–22, ECF No. 22-14. He testified that this range of service was based on his "training and experience," meaning the Fusion Center's experience that "[i]n the Milwaukee metro area . . . towers generally cannot reach more than a mile-and-a-half." *Id.* Neither Brosseau nor Draeger testified that information relating to the approximate range of service of the cell towers was included in the data that the police received from the cell phone companies.

Butler's postconviction counsel cross-examined Brosseau and Draeger about their methodologies. In particular, he was interested in the error rate for the kind of cell phone tracking they performed in this case. Neither officer could specify an error rate, but they testified that they knew from experience that their methodology worked.

6

Draeger in particular testified that the Fusion Center used the same methodology that the officers employed in Butler's case to track cell phones in real time. He testified that the police routinely find people located within the coverage areas estimated by the pie slices, and that from this he infers that the methodology works. Tr. at 24 & 28, ECF No. 22-14.

After the *Daubert* hearing, the trial court issued an oral ruling finding that the officers' trial testimony was admissible. ECF No. 22-1 at p. 42 of 57. The court found that "the majority" of the officers' testimony was lay testimony rather than expert testimony under the Wisconsin rules of evidence. *Id.* at 48. The court stated that this lay testimony consisted of merely plotting the locations of cell towers on a map, which was more of a clerical exercise than a task requiring specialized expertise. However, the court also found that the officers had received extensive training in the area of cell phone tracking and that, to the extent any part of either officer's testimony could be thought to be expert testimony, the officers were qualified to give that testimony. *Id* at 48–49. The trial court thus found that Butler's trial counsel did not render ineffective assistance in failing to object to the testimony.

Butler appealed the trial court's ruling to the Wisconsin Court of Appeals. That court affirmed, holding that no part of the officers' testimony constituted expert testimony under the Wisconsin rules of evidence, and that therefore trial counsel did not perform deficiently in failing to object to the testimony, and Butler did not suffer prejudice. The court stated that "a witness need not be an expert to take the information provided by a cell phone provider and transfer that information onto a map, which creates a visual aid from which a jury can more easily understand that

7

information." Op. at 12, ECF No. 22-5. The court then found that the officers did no more than visually depict information already contained in the cell phone records and that, therefore, they did not have to qualify as experts or satisfy the other *Daubert* requirements. *Id.* at 12–15.

Butler, still represented by appellate counsel, filed a petition for review in the Wisconsin Supreme Court. The petition raised a single issue: "Does police officer testimony about cell phone towers' range and area of coverage qualify as lay opinion testimony." Pet. for Review at 1, ECF No. 22-6. The Wisconsin Supreme Court denied review.

In his federal habeas petition,[1] Butler, now proceeding pro se, alleges a single ground for relief: that his trial counsel rendered ineffective assistance when he failed to object to the testimony of Officers Brosseau and Draeger. Butler argues that the officers did not qualify as experts under *Daubert*, and that their testimony was not admissible lay testimony.

In the respondent's view, Butler's habeas petition raises two claims: (1) that his trial counsel was ineffective in failing to object to the officers' testimony on the ground that it was improper expert testimony, and (2) that his trial counsel was ineffective in failing to object to the officers' testimony on the ground that it was improper lay testimony. The respondent then contends that Butler has procedurally defaulted his claim that trial counsel was ineffective in failing to object to the officer's testimony as improper expert testimony. This is so, argues the respondent, because, in his petition for review in the Wisconsin Supreme Court, Butler failed to raise this claim; instead, he

---

[1] I granted Butler leave to file an amended petition, so any references to the petition are to the amended petition at ECF No. 20.

8

argued only that his counsel was ineffective in failing to object to the officers' testimony on the ground that it was improper lay testimony. The respondent concedes that Butler properly preserved his ineffective-assistance claim based on the latter argument, but he contends that the argument fails on the merits. For purposes of this opinion, I will assume that Butler did not procedurally default any aspect of his claim of ineffective assistance of counsel and will address the entire claim on the merits. *See Carrion v. Butler*, 835 F.3d 764, 772 (7th Cir. 2016) (federal court can reject a habeas petition on the merits without resolving respondent's procedural defenses, including procedural default).

## II. DISCUSSION

Butler contends that he is entitled to habeas relief because his trial counsel rendered ineffective assistance. To establish a claim of ineffective assistance of counsel, Butler must show that his counsel performed deficiently and that he suffered prejudice as a result. *Strickland v. Washington*, 466 U.S. 668, 687–94 (1984). To establish deficient performance, Butler must demonstrate that counsel's representation fell below an objective standard of reasonableness as measured by prevailing professional norms. *Id.* at 687. This requires showing that counsel made errors so serious that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Id.* To establish prejudice, Butler must show that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* at 694.

The Wisconsin Court of Appeals resolved Butler's claim of ineffective assistance of counsel on the merits, and therefore the standard of review in 28 U.S.C. § 2254(d)

9

applies. Under that standard, I may grant relief only if the court's adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding.

At the outset, I note that the central issue in this case—whether the testimony of Officers Brosseau and Draeger was admissible either as lay testimony or expert testimony—is one of state law rather than federal law. Although this issue touches on the federal *Daubert* standard, it does so only because Wisconsin has chosen to enact that standard as part of its rules of evidence. The fact that Wisconsin has chosen to enact the federal standard does not transform the question of the admissibility of the officers' testimony into a question of federal law. Rather, the question remains one of state law, on which the state courts have the final say. *See Milone v. Camp*, 22 F.3d 693, 702 (7th Cir. 1994) (noting that the admissibility of evidence is generally a matter of state law and that a federal court ordinarily may grant habeas relief based on a state evidentiary ruling only when the admission of the evidence violated a specific constitutional guarantee). Thus, I cannot review whether the Wisconsin Court of Appeals properly applied *Daubert* or the Wisconsin rules of evidence governing the admissibility of lay opinions and expert testimony. In other words, the question in this case is not whether the Wisconsin Court of Appeals reached a decision that was contrary to, or involved an unreasonable application of, *Daubert* or any other Supreme Court case on the admissibility of lay and expert opinion testimony. The question is

whether the Wisconsin Court of Appeals reached a decision that was contrary to, or involved an unreasonable application of, *Strickland* and other Supreme Court cases concerning ineffective assistance of counsel. But here it is clear that the Wisconsin Court of Appeals did not reach such a decision. The court found that, because the officers' testimony was admissible under state law, Butler's counsel could not have been ineffective in failing to object to the testimony. This was a straightforward application of *Strickland* and was in accord with federal law. *See Hough v. Anderson*, 272 F.3d 878, 898 (7th Cir. 2001) ("An ineffective assistance claim based on a failure to object is tied to the admissibility of the underlying evidence. If evidence admitted without objection was admissible, then the complained of action fails both prongs of the *Strickland* test: failing to object to admissible evidence cannot be a professionally 'unreasonable' action, nor can it prejudice the defendant against whom the evidence was admitted.").

However, a remaining question is whether the Wisconsin Court of Appeals based its disposition of Butler's claim of ineffective assistance of counsel on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding. *See* 28 U.S.C. § 2254(d)(2). And here I think it might have. The court of appeals based its conclusion that the officers' testimony was not expert testimony on the factual premise that they did nothing more than "take the information provided by a cell phone provider and transfer that information onto a map, which creates a visual aid from which a jury can more easily understand that information." Op. at 12, ECF No. 22-5. But it is clear from both the officers' testimony at trial and their testimony at the *nunc pro tunc Daubert* hearing that they did more than that. They also applied some level of

11

expertise when they created the pie slices that represented the approximate coverage area of the antenna on each tower that Butler's phone connected to. The cell phone records did not state that each antenna had a range of about a mile or a mile-and-a-half. Nor did either of the witnesses who worked for the cell phone companies testify that an antenna located in the City of Milwaukee has a range of about a mile to a mile-and-a-half. Rather, the officers testified that, based on their prior experience, they believed that an antenna located in the Milwaukee metro area has such a range. Trial Tr. at 107–07, ECF No. 35-1; *Daubert* Hr'g Tr. at 21–22, ECF No. 22-14. Presumably, this belief was based on their prior experience using their cell phone tracking methodology. *See Daubert* Hr'g Tr. at 24.

Because the officers clearly did more than just transfer information from the cell phone records onto a map, it is at least arguable that the state court's decision was based on an unreasonable determination of the facts. Had the court accounted for the officers' testimony about how they created the pie slices emanating from each tower, it might have found that the officers were giving expert testimony. The court also might have found that the officers did not use a reliable methodology when they created the pie slices. But I need not resolve these issues because, as explained below, even if the pie slices had been removed from Officer Brosseau's map, the remaining information on the map (which consisted of nothing but information contained in the cell phone records), when combined with the other admissible evidence at trial, would have clearly shown that Butler's phone was near M.L.'s house at the time of the fire. Thus, I find that

Butler could not have been prejudiced by his trial counsel's failure to object to the officers' testimony.[2]

At trial, the state used the cell phone data to show that Butler's phone (and thus likely Butler himself) travelled to the area of M.L.'s apartment at the approximate time of the fire. Butler's defense, in turn, was that he was with his uncle at Melveretta Bradford's house the entire time, which was located more than 10 miles away from M.L.'s apartment. *See* Tr. at 22, ECF No. 22-10 (M.L. testifies that she lived at 9239 N. 75th St. in Milwaukee); Tr. at 74–75, ECF No. 22-10 (Bradford testifies that she lived at 1252 N. 14th St. in Milwaukee). The raw cell phone data received from the carriers showed that, about two hours before the fire, Butler's phone made calls to the Milwaukee County Transit System's route-information line. This call connected through a cell tower located near downtown Milwaukee, which was ten miles or more from M.L.'s apartment. From that point on, the phone connected with other cell towers that were located about one mile from a bus route that Butler could have used to travel between downtown Milwaukee and M.L.'s apartment. At 7:28 a.m., which was shortly after the fire was reported, Butler's phone connected with a cell tower located about one mile from M.L.'s apartment. Then, between 7:50 a.m. and 8:35 a.m., the phone connected with a series of towers that were located approximately one mile from a bus route that Butler could have used to get from M.L.'s apartment to Melveretta Bradford's house. After that (from 9:06 a.m. to 10:08 a.m.) someone used cell phones that

---

[2] I reach this conclusion as a matter of de novo review, since I am assuming for purposes of this discussion that the state court of appeals based its decision on an unreasonable determination of the facts. *See, e.g., Caffey v. Butler*, 802 F.3d 884, 894 (7th Cir. 2015) (when deference under § 2254(d) no longer applies, the court conducts de novo review).

13

belonged to Bradford's children to send text messages to M.L. that taunted her about the fire.

The evidence described in the prior paragraph—which does not include the pie slices that estimated the coverage area for each antenna—would have been sufficient to demonstrate that Butler's phone traveled from downtown Milwaukee to an area near M.L.'s apartment at the approximate time of the fire. The testimony of the cell phone company employees established that a phone will usually but not always connect to the closest tower. Tr. at 75 & 99–101, ECF No. 22-9. Moreover, the raw cell data showed that, on the morning of the fire, Butler's phone was consistently connecting to towers located near a bus route from downtown Milwaukee, to M.L.'s house, and then to Melveretta Bradford's house. From these two premises—which did not depend on expert testimony from Brosseau or Draeger—the jury would have easily concluded that Butler's phone travelled this path. It is simply implausible to think that Butler's phone would have consistently connected with towers located about one mile from that path if, in fact, it was sitting stationary inside Melveretta Bradford's house—which was more than 10 miles from M.L.'s apartment—the entire time. This is true regardless of the actual range and coverage area of any particular antenna. In other words, what was important was the *pattern* that the cell data revealed, not the exact location of the phone at any given time. Showing the geographic location of each cell tower was enough to establish the pattern, and therefore it was unnecessary to also provide an estimated coverage area for any particular tower.

What's more, factoring into the analysis the numbers that the phone dialed and the contents of the text messages that were later sent from Bradford's children's phones

makes the conclusion that Butler took the bus to M.L.'s apartment and was there at the approximate time of the fire inescapable. The phone was used to call the transit system's route-information line, which is something that a person would do if he or she intended to take the bus somewhere. Moreover, the text messages directly referenced the fire, and the record does not suggest any way that Butler could have known about the fire so soon after it occurred if he was not there to witness it.

In light of this evidence, Butler could not have suffered prejudice from the inclusion of the pie slices on Officer Brosseau's map and the officers' testimony about those pie slices. Thus, even if the trial court would or should have sustained an objection to the pie slices and the officers' testimony about them, and even if trial counsel rendered deficient performance in failing to make that objection, Butler could not prevail on a claim of ineffective assistance of counsel.

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that Butler's petition for a writ of habeas corpus is **DENIED**. The Clerk of Court shall enter final judgment. Pursuant to Rule 11 of the Rules Governing § 2254 Cases, I find that the petitioner has not made the showing required by 28 U.S.C. § 2253(c)(2), and therefore I will not issue a certificate of appealability.

Dated at Milwaukee, Wisconsin, this 3rd day of August, 2018.

                                                  s/Lynn Adelman
                                                  LYNN ADELMAN
                                                  District Judge